**In re V & M MANAGEMENT, INC., Debtor.**

**Bankruptcy No. 96–10123–CJK.**

United States Bankruptcy Court,
D. Massachusetts.

Dec. 8, 1997.

Judith Dein, Boston, MA, for Winter Hill Federal Savings Bank.

Paul Moore, for Chapter 11 Trustee.

Saul Shapiro, for BRA.

Paul Ricotta, Boston, MA, for Beacon Residential Properties Limited Partnership.

Kirk Jackson, Roxbury, MA, for Mandela Residents Cooperative Association, Inc.

Harold Murphy, for himself and Hanify & King, P.C.

Jeffrey Ogilvie, for MDOR.

Constantine Papademetriou, for City of Boston.

### MEMORANDUM OF DECISION ON CREDITORS' JOINT MOTION FOR EMERGENCY STAY, REVOCATION OF ORDER CONFIRMING PLAN, RETROACTIVE REMOVAL OF TRUSTEE, AND VACATUR OF FEE ORDERS

CAROL J. KENNER, Chief Judge.

Certain creditors of this estate—Victor Aronow, Chardon Financial Services, Matthew Mallen, Gary Leroy, Arthur Goldsmith, Georgette Maalouf, Alphonse and Noha Simon, Edward Mourad, and Habib Mourad [1]—have moved for (1) revocation of the order confirming the Joint Plan of Reorganization in this case ("the Plan"); (2) a stay of the confirmation order pending resolution of the motion to revoke; (3) retroactive removal of Stephen S. Gray as Chapter 11 Trustee in this case; (4) vacatur of the orders approving the fee applications of Stephen S. Gray as Chapter 11 Trustee and of Hanify & King as Debtor's counsel and return of their fees to the estate; (5) dismissal of this case; and (6) return of "the property" (presumably, the movants mean the Debtor's real estate, a 276-unit apartment complex) to the Debtor. The basis for all this relief is the movants' allegations, based on newly discovered evidence, that while the firm of Hanify & King remained counsel to the Debtor in this case, Stephen Gray, who is the Chapter 11 Trustee in this case, hired Hanify & King ("H&K") to represent him in his capacity in another Chapter 11 case; and neither Gray nor the firm disclosed that relationship to the Debtor, the creditors, and the Court in this case. The movants contend that Gray's undisclosed retention of Hanify & King created a conflict of interest that tainted the plan, and that the taint can be remedied only by revoking the order of confirmation.

The motion has drawn four objections: one from Stephen Gray, as Chapter 11 Trustee; another from Hanify & King; a third filed jointly by Winter Hill Federal Savings Bank, Beacon Residential Properties Limited Partnership, the Mandela Residents Cooperative Association (all of whom were proponents of the confirmed plan) and the Boston Redevelopment Authority (the "Joint Objection" of the "Plan Proponents" [2]); and a fourth filed by the City of Boston and the Commissioner of the Massachusetts Department of Revenue. The objections cite numerous defects in the motion, both procedural and substantive.

■ As a preliminary matter, the Plan Proponents request an early decision of the portions of the motion that seek to revoke the confirmation order and to stay that order pending adjudication. In support, they state that the mere pendency of the motion may affect the complicated financing arrangements that are a critical part of the approved Chapter 11 plan. The closing of the financing is imminent; if the closing were delayed beyond December 31, 1997, consummation of the plan—including transfer of the real estate and the payment of substantial dividends to all creditors—would be seriously jeopardized. For this reason, the Court agrees that these portions of the motion warrant expedited treatment and, if necessary, separate adjudication from the rest of the motion.

■ The movants seek principally to revoke the order of confirmation. A proceeding to revoke an order of confirmation is an adversary proceeding and as such is governed by the rules of Part VII of the Federal Rules of Bankruptcy Procedure. Fed. R.Bankr.P. 7001(5). Among other things, the proceeding must be commenced by complaint. Fed.R.Civ.P. 3, made applicable by

---

**1.** The Chapter 11 Trustee has recently objected to the proofs of claim filed by movants Gary Leroy and Matthew Mallen. Their standing as creditors is contingent on the resolution of these objections. The Trustee has also objected to the claims of others of the movants, but not in their entirety, so their standing as creditors is not in question.

**2.** The four proponents of the confirmed plan were Winter Hill Federal Savings Bank, Beacon Residential Properties Limited Partnership, the Mandela Residents Cooperative Association, and Stephen Gray, as Chapter 11 Trustee. The Boston Redevelopment Authority was not a plan proponent (i.e., it did not join in filing the plan and disclosure statement) but it nonetheless strongly supported the plan.

Fed.R.Bankr.P. 7003. The movants have filed only a motion, not a complaint. To remedy this deficiency—cited as one ground for objection to the motion—the movants requested that their motion be treated as a complaint and that they be granted leave to amend their complaint to put it in proper form. With the assent of the objecting parties, the Court allowed the request to treat the motion as a complaint. Accordingly, the Court will treat the motion as a complaint and, to the extent that the objections argue that the complaint fails to state a claim on which relief can be granted, will treat the objections as motions to dismiss. Leave to amend will be subject to resolution of the motions for dismissal.

The Joint Objection of the Plan Proponents contains what might properly be characterized as a Rule 12(b)(6) motion with respect to the demand for revocation. The Plan Proponents argue that the request for revocation should be dismissed because "it fails to allege legally sufficient grounds for revoking the Confirmation Order." Citing § 1144 of the Bankruptcy Code, they point out that the court may revoke an order of confirmation "only if such order was procured by fraud." 11 U.S.C. § 1144 (emphasis added).[3] They contend the complaint nowhere contains even an allegation of fraud, and that none of its allegations makes any reference or has any relevance to the findings made in the confirmation order. At most, they argue, the allegations may have bearing on the fee awards to Stephen Gray and Hanify & King; they have no relevance to the confirmation order.

In essence, this is an argument for dismissal under Fed.R.Civ.P. 12(b)(6). A motion under this rule tests the legal sufficiency of the complaint, not the evidence to support it. Accordingly, for purposes of this motion, the court must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the party to be dismissed. *Carreiro v. Rhodes Gill and Co., Ltd.*, 68 F.3d 1443, 1447 (1st Cir.1995). However, because only well-pleaded facts are taken as true, the court need not accept a complainant's unsupported conclusions or interpretations of law. *Id.; Washington Legal Foundation v. Massachusetts Bar Foundation*, 993 F.2d 962, 971 (1st Cir.1993); *United States v. AVX Corp.*, 962 F.2d 108, 115 (1st Cir.1992) ("a reviewing court is obliged neither to 'credit bald assertions, periphrastic circumlocutions, unsubstantiated conclusions, or outright vituperation,' . . . nor to honor subjective characterizations, optimistic predictions, or problematic suppositions" (citations omitted)). "A claim will be dismissed only if plaintiffs are not entitled to relief under any set of facts they could prove, within the scope of the complaint." *Redgrave v. Boston Symphony Orchestra, Inc.*, 557 F.Supp. 230, 233 (D.Mass.1983), citing *Harper v. Cserr*, 544 F.2d 1121, 1122 (1st Cir.1976).

■ As the Plan Proponents contend, the Bankruptcy Code strictly limits the grounds on which an order confirming a Chapter 11 plan may be revoked: "the court may revoke such order if *and only if* such order was procured by fraud." 11 U.S.C. § 1144 (emphasis added). The Bankruptcy Code does not define "fraud" for purposes of this section, and its meaning in this section is neither well settled nor easily formulated. The cases generally do not limit the term to common law fraud; though they use common law fraud as a starting point, they do not demand strict satisfaction of its requirements concerning reliance and damages. See, for example, *In re Kostoglou*, 73 B.R. 596, 598–599 (Bankr.N.D.Ohio 1987) (reliance by a creditor need not be shown if the court relied on the false representation and a creditor or other party was damaged thereby). In *Kostoglue*, the court stated:

**3.** Section 1144 states:
> On request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and a hearing, the court may revoke such order if and only if such order was procured by fraud. An order under this section revoking an order of confirmation shall—

> (1) contain such provisions as are necessary to protect any entity acquiring rights in good faith reliance on the order of confirmation; and
> (2) revoke the discharge of the debtor.
> 11 U.S.C. § 1144.

[T]he term [fraud] has never been given a precise definition for fear that the craft of men should find ways of committing fraud which might evade such a definition.... We do know that the term includes any "deceit, artifice, trick or design ... used to cheat another—something said or done or omitted with the design of perpetrating a cheat or deception." *Black's Law Dictionary*, 541 (Rev. 5th Ed.1979). We also know that "fraud" requires proof of bad faith, immorality or intentional wrongdoing, *Byrd v. Byrd (In re Byrd)*, 9 B.R. 357 (Bankr.D.D.C.1981). In the end, determinations of the existence of "fraud" must be made on the specific facts of each case with a view to whether, in each case, the requisite fraudulent intent has been shown.

*In re Kostoglou*, 73 B.R. at 598–599. The court further held that fraud in § 1144 was not limited to fraud on the court or to extrinsic fraud (fraud extrinsic to the matter tried before the court). "As a matter of law, we think that it encompasses any action in a bankruptcy proceeding by which a party obtains confirmation of a plan by deceptive practices with a deceptive intent." *Id.* at 599. See also *In re Michelson*, 141 B.R. 715, 724–725 (Bankr.E.D.Cal.1992) (tracing history of "procured by fraud" and holding that "any fraud will suffice").

### FACTS

Using *Kostoglou* as the starting point, I turn to the well-plead facts of the complaint and the inferences to be drawn from them, as augmented by facts of record in the case. The sequence of events is relevant to understanding the facts alleged.

The Debtor, V&M Management, Inc., commenced this case on January 8, 1996. The Debtor's principal asset was a 276–unit low-income apartment complex that, under Massachusetts law, G.L. c. 121A, constituted an urban renewal project under the supervision and regulation of the Boston Redevelopment Authority (BRA). The Debtor's business was the ownership and management of this apartment complex. On February 1, 1996,

the BRA, together with the City of Boston and the Commissioner of the Massachusetts Department of Revenue (collectively, the "Governmental Entities"), moved for the appointment of a Chapter 11 Trustee in the case; the motion was based on allegations that the Debtor had been grossly mismanaged by Alphonse Mourad, the Debtor's president, sole director, and sole shareholder. On February 8, 1996, while this motion was pending, the Debtor's original counsel, Frank Kirby, withdrew for health reasons, and the Debtor filed an application to employ Attorney Harold Murphy and his firm of Hanify & King, P.C. as successor counsel. On February 14, 1996, I allowed the application. At the time, the Debtor remained a debtor-in-possession. However, on April 1, 1996, after a hearing on the motion for an order to appoint a Chapter 11 trustee, I allowed the motion and ordered that a Chapter 11 Trustee be appointed in the case. On April 2, 1996, the United States Trustee appointed Stephen Gray in that capacity, and, upon application of the United States Trustee under Fed.R.Bankr.P.2007.1, I approved his appointment. Upon Mr. Gray's appointment, the Debtor ceased to be a debtor in possession.

Mr. Murphy and Hanify & King represented the Debtor in opposing the motion for an order to appoint a trustee. According to the movants, Mr. Murphy and the firm knew that the Debtor's president, Alphonse Mourad, wished to appeal from the order allowing the motion to appoint a trustee, but they declined to notice an appeal on behalf of the Debtor.[4] Hanify & King continued to represent the Debtor in the case until, on October 10, 1996, I allowed the application of Mr. Murphy and the firm to withdraw as Debtor's counsel. Mr. Gray has served as Chapter 11 Trustee in this case since his appointment and continues to serve in that capacity.

No plan of reorganization was filed in this case until six months *after* Hanify & King's withdrawal. On April 10, 1997, Trustee Gray, together with UDC/TCB Development Corporation, filed the first of seven plans

---

4. Mr. Mourad himself filed a notice of appeal from the order, and his appeal was later dismissed.

filed in the case. In the next four weeks, four more plans were filed: one by secured creditor Winter Hill Federal Savings Bank on April 15, 1997; the second by creditor Gary Leroy, together with Mourad, Owens & Associates on April 24, 1997; the third by the Mandela Residents Cooperative Association and Beacon Residential Properties Limited Partnership on May 12, 1997; and the fourth by creditor Edmund Shamsi on May 13, 1997. The Court ruled that the disclosure statements for each of the five plans did not contain adequate information and therefore were not approved. At a hearing on the adequacy of the disclosure statements on June 11, 1997, and in view of these inadequacies and of the lack of a confirmable plan at this late stage in the case, the Court also issued an oral order to show cause why the case should not be dismissed with prejudice.

In response, two further plans were filed: one proposed jointly by Chapter 11 Trustee Stephen Gray, Winter Hill Federal Savings Bank, the Mandela Residents Cooperative Association, and Beacon Residential Properties Limited Partnership (the "Joint Plan"), on June 27, 1997; and another by Gary Leroy and Mourad, Owens & Associates, filed on July 8, 1997. The Court approved the disclosure statements for both plans and, on September 26, 1997, after a hearing on confirmation of the plans, denied confirmation of the Leroy/Mourad Owens plan (because, among other reasons, it was rejected by creditors, 11 U.S.C. § 1129(a)(10)) and confirmed the Joint Plan. The sole appeal from the confirmation order was by Gary Leroy, but he has since stipulated to dismissal of his appeal.

The confirmed plan is lengthy and complex. In brief, it provides that, upon its effective date, the Debtor's apartment complex will be conveyed to a new entity (the "Buyer") controlled jointly by the Mandela Residents Cooperative Association and Beacon Residential Properties Limited Partnership, who will raise and invest substantial sums in renovating the property for continued use as low and moderate income housing. In exchange for conveyance of the property, creditors will receive payments on three dates, all funded principally by the Buyer.

On the effective date of confirmation, creditors will receive a total of $3,379,200. This includes a total of $2,779,200 on secured, administrative and priority claims, most of which were compromised, some severely, in order to make this plan possible. It also includes an initial payment of $600,000 on unsecured claims, representing an estimated 7.59 percent dividend (assuming $7.9 million of unsecured claims). Subject to certain contingencies, the plan also provides for two further distributions—at fifteen and thirty months after the effective date—of a further $900,000, of which $130,000 would go to unsecured creditors and raise the cumulative dividend to an estimated 9.24 percent. With respect to the Debtor's sole stockholder, Alphonse Mourad, the plan leaves his interest unaffected but pays him nothing on account of that interest, and the plan leaves the Debtor itself without assets or income.

Funding for the plan comes from two known sources and a third possible source. Of the funds promised to creditors, $600,000 derives from the first source: funds belonging to the estate and generated from operation of the apartment complex. The remaining $3,679,200 will come from the second source funding generated by the Buyer. The third source of funding consists of any assets belonging to the estate that are not transferred to the Buyer. These consist principally of unliquidated causes of action, including avoidance actions under the Bankruptcy Code. On the effective date, these assets will be transferred to a Creditor's Trust (through which all or most of the payments to creditors will be funneled), whose trustee will liquidate them and distribute the net proceeds, if any, to augment the promised distribution to unsecured creditors.

As required by 11 U.S.C. § 1129(a)(9)(A), the plan funds the payment of professional fees in this case, including those of Hanify & King as Debtor's counsel and of Stephen Gray as Chapter 11 Trustee. However, the amount and allowance of their fees were determined by separate order, not by the plan or the confirmation order. Aside from the fact that it provides the funding for their fees (subject to allowance), the plan does not

provide any benefit to Stephen Gray, Harold Murphy, or Hanify & King, P.C.

The gravamen of the creditors' complaint is that, after Mr. Gray's appointment as Chapter 11 Trustee and before Mr. Murphy and his firm withdrew as Debtor's counsel, Stephen Gray, in his capacity as Chapter 11 Trustee in another case, retained Harold Murphy and his firm, Hanify & King, to serve as trustee's counsel, and that this arrangement was never disclosed to the Court, the Debtor, or the creditors in the present case. More specifically, on June 11, 1996, Mr. Gray was appointed trustee in the Chapter 11 case of *American Shipyard Corporation*, which was filed and pending in the United States Bankruptcy Court for the District of Rhode Island. On June 14, 1996, Mr. Gray filed an application in that case to employ Harold Murphy and Hanify & King as trustee's counsel, and on July 15, 1996, the court (Votolato, J.) allowed the application. Murphy never disclosed this arrangement to Alphonse Mourad or the Court.

The creditors further contend that as Chapter 11 Trustee, Stephen Gray opposed the interests of the Debtor in this case by opposing every request to have the Court review the decision to appoint a trustee and to "clarify" Alphonse Mourad's standing as a corporate officer and stockholder to represent the corporate interests of the Debtor, and even to represent his (Mourad's) own interests in seeing that the factual and legal bases for the appointment of a Trustee were correct. Mr. Gray never disclosed in this case—in the case in general, in offering his first plan of reorganization, in opposing other plans, or in orchestrating the now-confirmed Joint Plan—that he had retained Mr. Murphy and his firm in the Rhode Island case. In the "Verified Statement" that Mr. Gray filed in the case on April 5, 1996, and again in the "Amended Verified Statement" that he filed on April 12, 1996, Mr. Gray stated that he did not have any connections with (among others) the Debtor or its attorneys and therefore that he was a "disinterested person." However, the movants allege, on April 3 or 4, 1996, Mr. Gray called Mr. Murphy and asked Mr. Murphy to be his counsel in this very case. Murphy declined and advised Alphonse Mourad that Gray had asked him to be his counsel in this case.

The creditors also make the following further allegations: (1) that Hanify & King stated (in its response to Alphonse Mourad's Opposition to Hanify & King's Request for Compensation) that in the months following the Trustee's appointment—the very time that Gray sought Hanify & King's representation in the Rhode Island case—Hanify & King "worked with the Trustee in the administration of the Chapter 11 case"; (2) Murphy's firm was owed substantial fees in this case ($154,987 less the $25,000 retainer), so it was in the firm's interests that a friendly trustee be appointed, so as not to oppose or challenge their eventual fee application; and (3) "any malpractice claim against Murphy or Hanify & King arising out of their negligent, if not worse, representation of [the Debtor] would be an asset of the Estate belonging to the Debtor, and Stephen Gray, as Chapter 11 Trustee, would control that claim. The possibility that Gray would even make or assert such a claim against the very law firm he retained in another case is highly unlikely." (Motion, ¶ 18)

## DISCUSSION

Given these facts, I conclude that the motion fails to plead that the order of confirmation was procured by fraud and thus fails to state a basis on which the Court could vacate that order. The complaint is deficient in three respects. First, the omission was not fraudulent because there was no obligation to disclose the omitted information in the confirmation process. Second, the omitted information, even if material to the confirmation process, had no significant bearing on that process and on the confirmation order, and therefore the order cannot be said to have been procured by its omission. And third, the alleged omission resulted in no damage or detriment to the complaining creditors or to the estate, much less any that would warrant vacating the plan.

### 1. *No Obligation to Disclose in the Confirmation Process*

■ First, the facts alleged in the motion do not allege a misrepresentation or omission in the procurement of the confirmation or-

der.[5] The basis of the motion to vacate is not an affirmative misrepresentation but an omission. It alleges that Messrs. Gray and Murphy failed to make a disclosure that they were obligated to make: *i.e.*, that Gray had retained Murphy and his firm in the Rhode Island case. An omission can form the basis of fraud only if the omitted fact is one that a party was affirmatively obligated to disclose in the circumstances. For purposes of this motion, I will assume without ruling that Gray was obligated to file in this case a verified statement disclosing his retention of H&K in the Rhode Island bankruptcy, see F.R.Bankr.P.2007.1(b); and that Murphy and his firm were obligated to disclose it to their client, the Debtor.[6]

But the issue now presented is whether Mr. Gray or any other proponent of the confirmed plan had an affirmative obligation to make that disclosure *in the plan confirmation process*. The movants cite no circumstances or facts that might give rise to such an obligation. Nor do they even allege in conclusory fashion that such disclosure was required by the adequate information requirement of § 1125(b), the confirmation requirements of § 1129(a) and (b), or any other statutory requirement having to do with plan confirmation.

As part of the confirmation process, § 1125 of the Bankruptcy Code requires that plan proponents distribute to the holders of claims and interests a written disclosure statement approved by the court as containing adequate information. 11 U.S.C. § 1125(b). The same section defines "adequate information" as

information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan.

11 U.S.C. § 1125(a)(1). This definition does not specify certain information that a plan proponent must, in every case, supply. Rather, its requirements vary from case to case, according to the nature of the plan, the needs of claim and interest holders, and the availability of information. In this case, the fact that Gray had retained H&K in the Rhode Island bankruptcy would not have helped creditors and interest holders to evaluate the merits of the plan. Neither Gray nor Murphy nor the Debtor (much less the estate they represented in the Rhode Island case) has any interest in the entity that, under the plan, is to acquire the Debtor's assets and fund the plan. Nor have they any other role in the plan. Gray's involvement in the plan is solely as one of several plan proponents, a legal midwife.[7] When the plan becomes effective, and by virtue of its becoming effective, the Chapter 11 Trustee's position will effectively be terminated, and Gray's role in this case and this reorganization will be over. The omitted information would have shed no light on either of the two major

---

5. As the Plan Proponents point out, the motion does even not use the word fraud and does not explicitly allege that the confirmation order was procured by fraud. However, the test for dismissal under Rule 12(b)(6) is not whether the complaint uses these specific words but whether the facts that it alleges or that might be adduced in support of it amount to procurement of the confirmation order by fraud.

6. The alleged conflict developed only after Gray was appointed Trustee in this case. By virtue of this appointment, the Debtor was no longer a debtor-in-possession and no longer occupied a position of fiduciary to the estate. Therefore, after the Trustee's appointment, Debtor's counsel was no longer under the estate's employ within the meaning of 11 U.S.C. § 327(a) and, accordingly, was not subject to the disclosure require-

ments in Rule 2014(a). Murphy and the firm were obligated to disclose the conflict only to their client, not the Court, the estate, or the complaining creditors.

7. In contrast, the three other proponents have substantial interests in the confirmed plan. Beacon Residential Properties Limited Partnership and the Mandela Residents Cooperative Association have ownership interests in the Buyer; in effect, they are buying the estate's principal asset and, in exchange, funding the plan. And Winter Hill Federal Savings Bank has a substantial interest because the plan not only promises to pay Winter Hill's secured claim, as substantially compromised, but also allows and quantifies that claim. The Trustee has no comparable interest in the plan.

issues with which creditors are concerned in evaluating a plan: the adequacy of the promised dividend and the likelihood that it will be paid. Given the nature of the confirmed plan and the facts alleged, the omitted information would not have helped creditors to make an informed judgment about the plan. The movants do not even *argue* that the omitted information would have helped them or other creditors in deciding how to make that judgment. As a matter of law, I conclude that § 1125 did not obligate the Trustee or any other party to disclose the omitted information in conjunction with confirmation of this plan.

The movants cite no other facts or legal basis that might have obligated the plan proponents to disclose the omitted information, and I find none in the facts before me. Therefore, I conclude that the motion fails to state a basis on which the Court could find an obligation to disclose.

### 2. *The Omission was not Instrumental in Procuring the Confirmation Order*

Under § 1144, revocation requires a showing not only of fraud, but that the confirmation order was *"procured* by fraud." 11 U.S.C. § 1144 (emphasis added). To procure is "to obtain; acquire" or "to bring about; effect." *American Heritage Dictionary,* (2d ed.1985). *Black's Law Dictionary* defines procure as "[t]o initiate a proceeding; to cause a thing to be done; to instigate; to contrive, bring about, effect, or cause. To persuade, induce, prevail upon, or cause a person to do something." *Black's Law Dictionary* 1208 (6th ed.1990). Therefore, in § 1144, "procured" is a requirement of substantial causation, requiring a showing that the alleged fraud was instrumental in obtaining the confirmation order and made a difference in the process. The motion for revocation fails to state a basis on which the confirmation order can be revoked because, on the facts alleged, the omitted information,

even if material to the confirmation process, had no substantial bearing or effect on the process or on the confirmation order, such that the order cannot be said to have been procured by the omission.

The burden is on the movants in the first instance to plead that the alleged fraud substantially affected the confirmation process and—more to the point—to specify how. The motion fails to do this and, despite repeated inquiry at the hearing on the motion, the movants did not specify any effect that the omission had on the confirmation process in general or on the confirmation order in particular. They vaguely allege only that Gray's failure to disclose his retention of H&K in the Rhode Island case cast a "taint" or suspicion on this case in general. They concede that they cannot be more specific and that they know of no resulting fraudulent effect on the confirmation process.[8] They cite nothing in the confirmation process that would appreciably have been altered by disclosure of the conflict. No effect is evident from the facts alleged. Therefore, the motion to revoke fails to plead that the confirmation order was *procured* by the omission, and, for that reason, fails to state a basis on which confirmation can be revoked.

### 3. *Failure to Allege Damages or Detriment to Movants or the Estate*

The element of damages is relevant to the movants' case for revocation in two respects: first, fraud itself requires proof that the alleged deceit resulted in harm, damages, or detriment; and second, the availability of revocation as a remedy is contingent on the nature and extent of the damage done. In this case, the movants completely fail to allege that, through the confirmation order, the omission resulted in damage, harm, or detriment of any kind, either to themselves or to the estate in general; consequently, the motion fails to state a claim for fraud, and, *a fortiori,* does not

---

**8.** At the hearing on this motion, movant Gary Leroy retracted his charge that there had been any fraud, conceding that fraud was "way too strong a term" for the wrong of which he was complaining. (Transcript of Hearing of November 19, 1997, at p. 6) Movant Arthur Goldsmith also conceded he had not alleged any specific fraud in the confirmation process, only a conflict of interest that "taints these proceedings" and "is therefore in a broader sense a fraud upon the Court." (Transcript, pp. 11–12) The other movants that appeared at the hearing added nothing to the remarks of Leroy and Goldsmith.

plead such fraud as could warrant vacating the confirmation order.

▪ Common law fraud requires proof that the plaintiff was damaged by the fraud. The cases interpreting § 1144 have tended to construe the damage requirement broadly. Thus, it does not necessarily require proof of pecuniary loss to the plaintiff but instead may be satisfied by anticipated loss to the estate as a whole, prejudice to the estate, or even, in the case of fraud on the court, by harm to the integrity of the judicial process (without proof of economic harm of any sort). *In re Michelson*, 141 B.R. at 725–726 (fraud under § 1144 includes fraud on the court, in which case "the important inquiry is whether the fraud harmed the integrity of the judicial process, not whether the fraud prejudiced a party or caused economic loss").

In this case, the motion for revocation alleges no harm or damage of any nature. It does not allege that through confirmation of the plan, the omission caused economic harm, actual or anticipated, to themselves or to the estate. It does not allege that the omission resulted in prejudice of any kind to their interests or to those of the estate. Nor does it even allege harm to the integrity of the judicial process, which requires proof that the undisclosed information was material to the confirmation process: having failed to state facts that, if proven, would establish the materiality of the undisclosed information, the complaint alleges no harm to the judicial processes pertaining to confirmation of the plan and therefore fails to state a claim for fraud on the court. I therefore conclude that the motion fails to allege that through confirmation of the plan, the alleged fraud resulted in damage, harm, or detriment in any form; and, for that reason, the motion fails to state a claim for fraud within the meaning of § 1144.

The motion does allege damage *outside* of the confirmation process and thus seeks reconsideration of the fee awards to Mr. Gray and to Hanify & King and recovery of possible overpayments to them for the benefit of the estate.[9] (I make no ruling on that issue at this time.) But these fee awards were not made through the plan or the confirmation process or in the confirmation order; rather, they were made through separate and independent orders whose reconsideration would not affect the confirmation order or its validity. Under the plan, such rights of recovery would be property of the Creditor's Trust and would thus be preserved for the benefit of the estate.[10] The point here is that the damage alleged in the complaint is not alleged to have occurred in the confirmation process or as a result of confirmation.

▪ Moreover, the alleged damage— *i.e.*, overpayment of fees to Gray and H&K— would not justify revoking the order of confirmation. Section 1144 specifies that when confirmation is procured by fraud, the court "may" revoke the confirmation order. 11 U.S.C. § 1144. The Code thus affords the court considerable discretion in its choice of remedies. The court need not and should not revoke a confirmation order if other remedies would clearly be more appropriate. In this case, the motion does not allege damage that, if proven, would warrant revocation. To the extent that it alleges harm to the estate at all, it is harm that can adequately be redressed by an award of money damages. Given the nature of the alleged injury, damages are clearly the appropriate remedy. Revocation would accomplish nothing for the estate or for the movants.

More importantly, revocation would itself cause far greater harm than the omission is alleged to have caused, all to parties as to whom the movants have alleged no wrongdoing. Revocation would effectively cancel creditors' rights to dividends totaling almost

---

9. Hanify & King did not seek, and the Court did not allow, compensation for the time it expended on this case after April 8, 1996, which precedes the period of the alleged conflict. Therefore, the relevance of the alleged conflict to the firm's fee application is unclear. Of the time allowed, only 17 hours (representing $4,064 of the total fees allowed, $146,899.50) pertains to time on or

after April 2, 1997, the date on which Gray was appointed trustee in this case.

10. Likewise, if (as the motion suggests but does not expressly allege) the estate has a right of recovery against Hanify & King for breach of its obligations to the Debtor in this case, that right too would belong to the Creditors' Trust.

$3.7 million under the plan, dividends that the motion does not suggest are inadequate or wrongly distributed. The motion does not suggest that the creditors are not entitled to these dividends, much less that they can or would do better under any other scenario that would follow revocation.[11] Revocation would also cancel the promised and badly-needed rehabilitation (by the Buyers) of the Debtor's apartment complex, to the detriment of its tenants and the surrounding community. And revocation would seriously harm the other entities with whom the Trustee joined in proposing the confirmed plan: Winter Hill Federal Savings Bank, the Mandela Residents Cooperative Association, and Beacon Residential Properties Limited Partnership. They are not implicated by the movants' allegations; and their plan of reorganization would have no less merit had the Trustee not joined them in proposing it. In view of the unimplicated rights of all these parties (creditors, tenants, and proponents) under the plan and of the availability of money damages as an adequate remedy, revocation cannot be justified. Therefore, in addition to its other defects, the motion fails to state that the alleged fraud resulted in such damage or prejudice as would warrant revocation.

### Conflict of Interest Is Not Itself Fraud

■■■ The movants do not suggest that the alleged conflicts of interest created by Gray's employment of Hanify & King in the Rhode Island case did themselves constitute fraud within the meaning of § 1144. A conflict of interest, in itself, does not amount to fraud. Section 1144 requires actual fraud. But a conflict of interest, standing alone, creates only a potential for wrongdoing; a trustee or attorney who operates under a conflict will not necessarily defraud or compromise the interests of the client, estate, or beneficiary to which he or she owes loyalty. Here the creditors have not alleged that the conflict resulted in an actual breach of obligation on the part of either the Trustee or of Hanify & King. They have alleged only a

conflict of interest, and that in itself is not fraud under § 1144.

Moreover, the conflict of interest ended on October 10, 1996, upon Hanify & King's withdrawal from the case. This occurred a full six months before even the first plan of reorganization was filed in this case. Thus the conflict itself ended well before the confirmation process began. Even if the conflict *per se* were deemed fraud, it did not, on the facts alleged, reach into and affect the confirmation process.

### Default for Failure to Prosecute

■■■ The Court held a hearing on the motion to vacate (and on the motion for stay pending adjudication) on November 19, 1997. Five of the movants—Victor Aronow, Chardon Financial Services, Matthew Mallen, Alphonse Simon, and Noha Simon—failed to appear at the hearing, either by counsel or *pro se*. As to these five, the motion to revoke the confirmation order shall be denied not only for failure to state a basis on which the confirmation order can be revoked, but also for failure to prosecute.

### Amendment as Alternative to Dismissal

■■■ After the hearing on this motion, the movants (except Gary Leroy) filed a motion to supplement the arguments they had made at the hearing. In that motion, they argued (among other things) that the Court should not dismiss their complaint (the motion to revoke) without affording them an opportunity to replead or amend it. They did not indicate what purpose amendment would serve or specify how the complaint would be amended. The Court sees no point in permitting amendment with respect to the motion to revoke the confirmation order. The motion/complaint does not suffer just from inartful pleading; rather, as my inquiries and the movants' answers made clear at the hearing, the movants simply have no basis on which the confirmation order can be revoked. Amendment would be futile.

---

11. Although I do not base my ruling on this finding, it was clear at the confirmation hearing that if the Joint Plan were not confirmed, the first mortgagee, Winter Hill Federal Savings Bank, would foreclose on the Debtor's apartment complex, and unsecured creditors would receive no dividend.

### Conclusion

For the reasons set forth above, a separate order has entered denying the motion to revoke the confirmation order. By the same order, the motion for stay pending adjudication has been denied as moot, the motion to revoke having already been adjudicated.[12] The Court does not by this memorandum of decision or the separately issued order purport to resolve the portions of the motion that seek reconsideration and revocation of the fee awards to Stephen Gray and to Hanify & King, retroactive removal of Stephen Gray as Chapter 11 Trustee, dismissal of the case, and return of the property to the Debtor; the Court will deal with those portions later.[13] Pursuant to Fed.R.Civ.P. 54(b), made applicable by Fed.R.Bankr.P. 7054, I have directed that judgment should enter at this time as to the counts for revocation of the confirmation order and for a stay pending adjudication. There is no just reason to delay entry of judgment as to these counts. The pendency of these counts would interfere with and possibly derail the financing and tight timetable for implementation of the plan, and thus impair the substantial rights thereunder of Beacon Residential Properties Limited Partnership, the Mandela Residents Cooperative Association, and the creditors, as to whom there is no just cause for delay.

---

**12.** I note further that the motion does not, even in rudimentary fashion, address the criteria for issuance of a stay or state cause to issue one.

**13.** The requests for dismissal and for return of the property to the Debtor appear to be contingent on revocation of the confirmed plan. If so, the denial of revocation will affect the disposition of those requests. However, since the motion does not set forth any argument for dismissal and for return of the property to the Debtor, I do not know the basis for those requests and cannot adjudicate them at this juncture.